## UNITED STATES DISTRICT COURT
## THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**LISA L. BURNETT,**
     **PLAINTIFF**

**CASE NO. 1:07-CV-00843**
**(WEBER, J.)**
**(HOGAN, M.J.)**

**VS.**

**COMMISSIONER OF**
**SOCIAL SECURITY,**
     **DEFENDANT**

### REPORT AND RECOMMENDATION

Plaintiff filed her application for disability insurance benefits (DIB) on March 4, 2004

and her application for supplemental security income (SSI) on January 30, 2004. She alleged an

onset date of July 5, 2003. Plaintiff's applications were denied, both initially and upon

reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law

Judge (ALJ) at Dayton, Ohio on September 1, 2005. At the hearing, Plaintiff, who was

represented by counsel, testified as did Vocational Expert (VE), Vanessa Harris. Following an

unfavorable decision in January, 2006, Plaintiff processed an appeal to the Appeals Council,

which granted review and remanded the case for consideration of new and material evidence. On

remand, a subsequent hearing before the ALJ was held January 23, 2007. The ALJ again issued

an unfavorable decision in March, 2007. Plaintiff processed an appeal to the Appeals Council,

which refused review in August, 2007. Plaintiff then filed her Complaint with this Court in

October, 2007, and sought judicial review of the final order of the Defendant Commissioner

denying her benefits.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ made a single error which had a detrimental effect upon the ultimate decision in her case. Plaintiff argues that the state agency review of the file was not conducted by a physician and the ALJ gave insufficient weight to the opinion of Dr. Johnson.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the September 1, 2005 hearing that she was 41 years old and weighed about 310 lbs. She lived with her husband and two daughters, aged 4 and 15. Plaintiff testified that she stopped working in July 2003 due to increased back and knee pain. She was working as a server in a restaurant and could not carry the 20 to 30 lb. objects required on her job, as well as stand on her feet for an entire day.

Plaintiff further testified that she had constant pain in her low back and right knee. She did not take any prescribed pain medication because she was afraid of addiction. She used over-the-counter Aleve or Tylenol but those medications did not help. Plaintiff took prescribed medications for diabetes mellitus, thyroid, stomach upset and high blood pressure. Her blood sugar levels were running high, between 270-300. She stated that she ate fast food or fried food several times a week. Plaintiff also testified that she had asthma, which bothered her if she walked a lot, was around smoke or when it was hot.

Plaintiff further testified that she was in a constant state of depression due to her weight gain. She had crying spells, ate too much, isolated herself in her room and did not go out. She had anxiety attacks two to three times every few weeks, during which she had heart palpitations and found it hard to breath. She stopped seeing her psychiatrist and counselor in October 2004.

2

She blamed the medications for causing her weight gain and felt that she was misdiagnosed. She then had been prescribed Lexapro, by her family doctor.

Plaintiff testified that she spent a typical day watching television and taking care of her four year old daughter. She did not sleep during the day, and got five to six hours of sleep at night. She cooked one to two meals a week, but her husband, who did not work and stayed home, did most of the cooking and housework. She rarely swept and did not do the dishes. Because the laundry machines were in the basement, she did not do the laundry. Her husband usually did the shopping. She went shopping only once every four or five weeks. She rarely visited others. She drove a car only two to three times a month. She did drive to the hearing.

Plaintiff estimated that she could only walk three to five minutes, stand ten to fifteen minutes, and sit fifteen minutes at a time. She could lift no more than a gallon of milk.

She stated that having gastric bypass surgery "would reverse basically all of my disabilities." (Tr. 445-467).

Plaintiff testified at the January 23, 2007 hearing that her problems began before she stopped working entirely due to multiple "life issues". She ended up seeing a counselor and psychiatrist at Middletown Regional Hospital. Plaintiff testified that she stopped seeing her treating mental health specialists in 2004 because she did not like that her therapist told her she needed to leave her husband. She also decided that her problems were all physical. "It's all because of my weight, because I'm 300 pounds – 313 pounds and I'm huge, and I'm fat, and I can't do anything that's what's making me have the problem that I'm having mentally." Plaintiff underwent gastric bypass surgery. Seven months after the surgery, Plaintiff's weight was 194 lbs. Her knees stopped hurting in the first three months and knee pain was no longer an issue for

3

her. Plaintiff testified that four months following her surgery, her back pain returned.

Plaintiff testified that she still experienced depression. She testified she spent twenty-one hours a day in her room and that she ate and interacted with her family in her bedroom. She did not dress everyday. She had to force herself to eat because of poor appetite. She still had borderline diabetes mellitus. She had vivid nightmares. She slept four to six hours at night, but at other times slept 18 to 20 hours. She got agitated at the smallest things. She had no energy. She thought originally this agitation was due to her weight, but the gastric bypass with subsequent weight loss did not help. Plaintiff testified still could not take some medications because of weight gain. She felt worthless. Her mind raced about everything, which is why she could not sleep at night. (Tr. 478-503).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ's hypothetical question to the VE assumed an individual who has the residual functional capacity to lift consistent with light work and occasionally crouch, stoop and climb stairs. The hypothetical individual cannot crawl, balance or climb ladders, ropes or scaffolds. The hypothetical individual can have only occasional contact with supervisors and co-workers, no contact with the public, no complex instructions, and limited to low-stress jobs defined as jobs that did not involve above-average pressure for production, fixed production quotas, or work that was other than routine in nature and work that was not hazardous. The VE responded that there would be a representative number of light and unskilled jobs which Plaintiff could perform, such as marker II, box inspector, and microfilm processor, which numbered approximately 4,000

4

jobs in the regional economy. The VE also testified about unskilled, sedentary jobs which

Plaintiff could perform, such as surveillance system monitor, nut sorter, and table worker, which

numbered approximately 3,100 jobs in the regional economy. When asked about the number of

jobs that would allow the individual to alternate between sitting and standing at will, the VE

testified that all the jobs remained. (Tr. 469-72).

## OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ concluded that Plaintiff has severe impairments of lumbar degenerative disc

disease with moderate obesity, right knee chondromalacia, and recurrent major depression. The

ALJ found that none of her impairments met any Listing, either alone or in combination.

The ALJ concluded that:

> The claimant lacks the residual functional capacity to: (l) lift more
> than 10 pounds frequently or 20 pounds occasionally; (2) do any
> job where she is not free to alternate sitting or standing positions at
> one-half hour intervals throughout the day; (3) crawl, kneel, or
> climb ladders or scaffolds; (4) perform greater than occasional
> crouching, stooping, or climbing of stairs; or (5) do other than low
> stress work activity (i.e., no job involving above average pressure
> for production, work that is other than routine in nature, or work
> that is hazardous) (20 CFR 404.1545 and 416.945).

(Tr. 34).

## MEDICAL RECORD

Plaintiff began treatment in April 2002 at the Outpatient Clinic at Middletown Regional

Hospital. She originally treated with a counselor, Ms. Eisenmann, and psychiatrist, Dr. Mitchell.

When Dr. Mitchell left the practice, Plaintiff saw Dr. Gillingham, another psychiatrist beginning

5

in June 2002. The records document the fact that Plaintiff was having significant problems with anger management and dramatic mood swings. She stopped working following several family crises (death of brother, a miscarriage, husband on disability for his back, sick parents, and marital problems). Plaintiff was prescribed multiple medications, which were frequently adjusted. (Tr. 398-415).

Plaintiff began seeing Judith Freeland, M.D. and a counselor, Cobin Trout, M.S., P.C., at Comprehensive Counseling Center in January 2003. On intake, Plaintiff was diagnosed with major depression with borderline traits. (Tr. 383). Dr. Freeland started Plaintiff on multiple medications. (Tr. 368-83). By May, 2003, Plaintiff reported to Dr. Freeland that she was "doing great" as far as her mood was concerned, but she admitted sleeping 12-16 hours a day. Dr. Freeland cut her Restoril dose in half. (Tr. 377).

In October 2003, Plaintiff presented to her family physician, Pushpa Shah, M.D., complaining of a sharp pain in her lower back when she bent over to plug in her vacuum; she had no history of back problems. Examination showed diffuse spasm and tenderness. Range of motion was limited, with flexion at 30°. She was diagnosed with acute lumbar sprain and strain, sciatica, hypertension, gastroesophageal disease (GERD), asthma, depression, and fatigue, weight gain, and alopecia. (Tr. 264-65). An x-ray of Plaintiff's lumbar spine taken October 24, 2003, demonstrated mild degenerative changes with osteophytic lipping at the L4 level. (Tr. 278). Examination on November 19, 2003 continued to show spasm. (Tr. 261).

In December 2003, Dr. Freeland reported that Plaintiff was under her care and was diagnosed with major depression and borderline traits. She indicated that Plaintiff was not stable enough to deal with employment at that time and recommended that she be off work from

6

November 2003 until January 21, 2004, when she would be re-evaluated. (Tr. 255). Plaintiff did not return until March 2004, at which time her medications were adjusted. (Tr. 252, 371).

In March, 2004, Plaintiff complained of a 2-3 month history of her knees swelling. She was diagnosed with osteoarthritis of both knees and morbid obesity. (Tr. 258).

A mental residual functional capacity assessment was prepared by Caroline Throckmorton Lewin, Ph.D., in June 2004. Dr. Lewin reported Plaintiff was able to understand and follow directions, but her socialization might be reduced due to physical problems. She noted that Plaintiff's treating source stated that Plaintiff did not report difficulty in adapting to change. Dr. Lewin indicated that Plaintiff remained able to handle most instructions and basic tasks. (Tr. 227-42).

Plaintiff saw Jon Sulentic, D.O., an orthopedist for evaluation of her right knee in June 2004. On examination, there was generalized pain on palpation of the knee with medial and lateral joint line pain. He diagnosed osteoarthritis of the right knee with chronic knee pain and ordered an MRI. (Tr. 246). The MRI of Plaintiff's right knee revealed intermediate- to high-grade patellofemoral chondromalacia and mild medial compartment arthropathy. The cruciate ligaments and menisci were intact. (Tr. 247). Plaintiff returned to Dr. Sulentic in July 2004, at which time a long discussion was held regarding various treatment options, including weight reduction, which Dr. Sulentic believed was mandatory. He gave Plaintiff a corticosteroid injection in her right knee. (Tr. 245).

In July 2004, Plaintiff met with counselor Corbin Trout, and reported that, although she did not want to come to her session because she was having a bad day, she wanted a break from her home, her husband, and three-year-old child. Plaintiff discussed her relationship with her

7

husband and financial issues. Plaintiff told Ms. Trout that she desired to work again and missed the social interaction and feeling of competence. Plaintiff stated that she had a job interview the next day, but did not think that she would be able to get herself to go to it. (Tr. 250). Plaintiff also saw Dr. Freeland in July 2004, and they discussed her husband's alcoholism. (Tr. 249).

In August 2004, Plaintiff saw M. Scott True, M.D., for her right knee. An x-ray of Plaintiff's right knee showed medial compartment narrowing. Dr. True diagnosed medial compartment arthrosis of the right knee and had a lengthy discussion with Plaintiff regarding her options. He thought she was a good candidate for a unispacer. (Tr. 384).

Plaintiff's counselor, Corbin Trout, completed a Mental Impairment Questionnaire in August 2004. She reported that Plaintiff had demonstrated many signs and symptoms of depression. Regarding Plaintiff's treatment and response, Ms. Trout wrote that Plaintiff had increasing difficulty keeping scheduled counseling appointments. Ms. Trout opined that Plaintiff had marked limitations in her ability to maintain social functioning, as well as her ability to maintain concentration, persistence or pace. Ms. Trout concluded that Plaintiff would likely miss more than four days of work per month. When asked for clinical findings that demonstrated the severity of Plaintiff's impairments, Ms. Trout wrote "see intake." (Tr. 302-05).

Dr. Freeland completed a Psychiatric Evaluation Form for Affective Disorders in September 2004. She noted that Plaintiff was very inconsistent with appointments and had seen her once every two to three months. Dr. Freeland reported Plaintiff's diagnoses as major depression and borderline traits and indicated that she had marked or extreme limitation in her ability to plan daily activities, initiate social contact, hold a job, concentrate, complete tasks in a timely manner, and assume increased mental demands associated with competitive work. She

8

thought Plaintiff had moderate impairment in her grooming and personal hygiene per Plaintiff's report, but Plaintiff was always groomed and appropriate for her sessions. Plaintiff had also reported moderate difficulty with cooking and cleaning. Dr. Freeland also noted that Plaintiff had moderate impairment of her ability to relate to and trust her husband, and that she isolated and stayed home a lot and slept a lot. Plaintiff also had a moderate impairment of her ability to persist at tasks. (Tr. 306-12).

Also in September 2004, Plaintiff's file was reviewed by a State agency claims adjudicator, Wendy Rutter. She concluded Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk at least two hours in an eight-hour workday, up to four hours total; sit about six hours in an eight-hour workday; frequently stoop; occasionally climb ramp/stairs and crouch; and never climb ladders/ropes/scaffolds, balance, kneel, or crawl. (Tr. 279-84). Willa L. Caldwell, M.D. reviewed the medical record and approved Ms. Rutter's evaluation. (Tr. 82, 329).

A mental residual functional capacity assessment was prepared by Guy G. Melvin, Ph.D. in September 2004. Dr. Melvin opined that Plaintiff would be moderately limited in multiple areas of mental functioning. Plaintiff retained the ability to understand and remember routine instructions in a predictable setting and could relate to others, but demands should be predictable and routine to avoid stress. (Tr. 285-301).

In November 2004, Plaintiff was seen at The Back and Spine Center, where she reported low back pain along with pain radiating into her legs and numbness in her two small toes. Therapeutic exercises were attempted, but because Plaintiff could not lie on her back, she was not able to finish all the therapies. (Tr. 389).

An MRI of Plaintiff's lumbar spine taken in December 2004, showed a central disc protrusion at L5-S1 eccentric to the left side and compromising the left S1 nerve root. (Tr. 313).

In July 2005, David L. Schumacher, M.D., saw Plaintiff to discuss a laparoscopic bariatric procedure and concluded she was a good candidate for the procedure for relief of her co-morbid conditions (hypertension, diabetes mellitus, ankle edema, knee and back pain, increased triglycerides, and GERD), which should improve with adequate weight loss. (Tr. 394).

In August 2005, Aleda Johnson, M.D., in the same office as Dr. Shah, completed a Diabetes Mellitus Residual Functional Capacity Questionnaire and reported that Plaintiff was seen in her office since October 2003 and was usually seen every two to three months. She noted Plaintiff's diagnoses as non-insulin dependent diabetes, GERD, depression, edema, back pain, obesity, bronchial asthma and hyperlipidemia. Dr. Johnson noted on examination that Plaintiff was anxious, had bilateral lower extremity edema, and low back pain. Dr. Johnson did not think that Plaintiff was capable of even low stress work and that pain would frequently interfere with her ability to work. Dr. Johnson did not think that Plaintiff could stand/walk for even two hours or sit for two hours. Dr. Johnson also indicated that Plaintiff would need to be able to shift positions regularly and would need to elevate her legs 80% of the time. Dr. Johnson noted that Plaintiff could only rarely lift, and even then, only less than 10 pounds. (Tr. 423-26).

In October 3, 2005, Stephen P. Fritsch, Psy.D., performed a consultative psychological evaluation of Plaintiff. Dr. Fritsch noted that at times during the examination Plaintiff was obviously emotional with tears streaming and tension in her voice. He noted she reported symptoms of depression. Plaintiff also reported herself as very anxious and reported multiple worries about her family and her own health. On examination, Dr. Fritsch felt Plaintiff did not

show signs of a psychotic process, but did show rumination and anxiety-based cognitive distortions. Dr. Fritsch diagnosed major depression and assigned a GAF (global assessment of functioning) of 52. Dr. Frisch concluded that Plaintiff's cognitive ability was in the average range and that she was able to maintain appropriate relationships with supervisors, co-workers or the general public. He also thought Plaintiff would have moderate difficulty adaptively responding to typical demands and stresses of the workplace. (Tr. 314-20).

Plaintiff returned to Dr. Sulentic in May 2006, complaining of bilateral knee pain. On examination, there was pain on palpation of both knees with a low grade effusion. Range of motion was painful and there was a pronounced crepitus. X-rays showed degenerative changes in both knees. Dr. Sulentic diagnosed bilateral knee arthralgia primarily affecting the medial compartment and the patellofemoral compartment. He performed viscoelastic supplementation on both knees. (Tr. 433). Following a second injection in both knees, Plaintiff reported improvement. (Tr. 432).

Plaintiff underwent gastric bypass surgery in June 2006. (Tr. 363, 434-37). Upon discharge, Plaintiff was instructed to drink sixty-four ounces of fluid daily, not to lift over twenty pounds for two weeks, and to "walk, walk, walk." (Tr. 436).

A January 2007 MRI of Plaintiff's lumbar spine demonstrated grade 1 anterolisthesis without evidence of spondylolysis at the L4-5 level, with a shallow left paracentral bulge resulting in abutment of bilateral descending L5 nerve roots without frank compression and central herniated nucleus pulposus at the L5-S1 level resulting in abutment of the descending right and left effacement of the descending left S1 nerves. (Tr. 442-43).

11

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.
Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §
405(g). The Court's sole function is to determine whether the record as a whole contains
substantial evidence to support the Commissioner's decision. The Commissioner's findings
stand if they are supported by "such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing
*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the
Commissioner's findings are supported by substantial evidence, the Court must consider the
record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible
individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is
dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To
establish disability, plaintiff must demonstrate a medically determinable physical or mental
impairment that can be expected to last for a continuous period of not less than twelve months
and plaintiff must also show that the impairment precludes performance of the work previously
done, or any other kind of substantial gainful employment that exists in the national economy.
20 C.F.R. § 416.905.

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age
65, file an application for such benefits, and be under a disability as defined by the Social
Security Act. 42 U.S.C. §§ 416(I),423. Establishment of a disability is contingent upon two
findings. First, plaintiff must suffer from a medically determinable physical or mental

12

impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(I)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2). Similarly, to qualify for SSI benefits, plaintiff must likewise file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months and plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if

13

the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771

14

(6th Cir. 1987).

The Commissioner's Regulations establish a hierarchy of acceptable medical source opinions that includes treating physicians or psychologists; examining, non-treating physicians or psychologists; and non-examining state agency medical reviewers. *See* 20 C.F.R. §404.1502, 1527(d), (e), (f). The hierarchy begins at the top with treating physicians or psychologists, whose opinions are given controlling weight if they are well supported by medically acceptable data and if they are not inconsistent with other substantial evidence of record. *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. August 2, 2004); *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2), §416.927(d)(2). If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)); *see also* 20 C.F.R. §416.927(d)(2).

Next in the hierarchy are examining physicians and psychologists, who often see and examine claimants only once. Their opinions are weighed under the same factors – supportability, consistency, and specialization, etc. – as the opinions of treating physicians or psychologists. *See* 20 C.F.R. §404.1527(d), §416.927(d)(2). In general, more weight is given to examining medical source opinions than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1), §416.927(d)(1). However, the opinions of non-

15

examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views these non-examining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p at Introduction.

Still, non-examining physicians' opinions are on the lowest rung of the hierarchy of medical source opinions. As the Commissioner reminds, speaking through her Ruling:

> The Regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.

> For this reason, the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Councils levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other facts that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

Social Security Ruling 96-6p at Policy Interpretation.

The Commissioner's Regulations mandate that ALJs provide meaningful explanations for the weight they give to a particular medical source opinion. Regarding treating physician or psychologist, the Regulations state, "We will always give good reasons in our notice of determination of decision for the weight we give [the claimant's] treating source's opinion."

16

*Wilson,* 378 F.3d at 544 (quoting 20 C.F.R. §404.1527(d)(2)). Similarly, with regard to non-examining state agency physicians or psychologists, the Regulations mandate, "Unless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, non-treating sources, and other non-examining sources who do not work for us." 20 C.F.R. §404.1527(f)(2)(ii) (emphasis added); *see* 20 C.F.R. §416.927(f)(2)(ii).

Where the medical evidence is consistent, and supports plaintiffs complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler,* 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky, 35* F.3d at 1039-41.

## OPINION

Plaintiff's only assignment of error is that the ALJ erred in relying on the State agency review where this review was not conducted by a physician and was in contradiction to the opinion of the treating, or at least, examining medical source. *See* Doc. 6 at 10. The Court notes that Plaintiff did not raise any other issue in her Statement of Errors. Plaintiff has, therefore,

17

waived any additional claim of error. *Cf., Heston v. Commissioner of Social Security,* 245 F.3d

528 (6th Cir. 2001).

A review of the ALJ's decision reveals a well-supported description of the medical source

opinions and records. (Tr. 16-35). Contrary to Plaintiff's contentions, however, the ALJ provided

sufficient information to show that he weighed the medical source opinions as the Regulations

required. The ALJ stated in his written decision that,

> The physician who reviewed the evidence of record in September
> 2004 for the BDD concluded that claimant was capable of lifting
> consistent with light work. He limited standing to four hours total
> in a work day. In view of claimant's combined knee and low back
> problem, as well as her substantial obesity until at least the latter
> part of 2006, I find it more appropriate to give her an alternate
> sit/stand option restriction as such a restriction will help her
> maintain flexibility and minimize stiffness caused either to the
> right knee or low back by prolonged sitting and standing. An
> alternate sit/stand restriction would permit her to limit standing to
> four hours or even less in a day if she found necessary. The
> physician also recommended that claimant avoid climbing of
> ladders and scaffolds, kneeling, and crawling, and limit crouching
> and climbing of stairs to occasional. I have adopted those
> suggested postural restrictions, but have also added a restriction to
> occasional stooping in view of claimant's disc bulge and significant
> past obesity.

(Tr. 26). Plaintiff argues that the ALJ erred by relying on the September 2004 records review

because it was not performed by a physician. The review form was drafted by a claims

adjudicator, but as the record reflects, was reviewed and approved by a physician, Willa L.

Caldwell, M.D. on September 9, 2004. (Tr. 82, 329). Moreover, consistent with Defendant's

opposing argument, "[t]he signature of a State agency medical or psychological consultant on a .

. . [Disability Determination and Transmittal Form] . . . ensures that consideration by a physician

. . . designated by the Commissioner has been given to the question of medical equivalence at the

18

initial and reconsideration levels of administrative review." *Hicks v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 757, 762, 2004 WL 1687945, at *4 (6th Cir. July 27, 2004) (citing Soc. Sec. Rul. 96-6p, 61 Fed. Reg. 34,466, 34,468 (July 2, 1996)). Dr. Caldwell's signature on the transmittal forms indicates that she reviewed the record evidence, including the medical evidence, and concluded Plaintiff was not disabled. Under existing law, that "professional input" is sufficient to satisfy 20 C.F.R. § 404.1526(b). *See id.* Plaintiff's contention lacks merit.

Plaintiff next contends that the ALJ erred in his evaluation of Dr. Johnson's August 2005 opinion. In assessing Dr. Johnson's opinion, The ALJ did not give her opinion any significant weight, let alone controlling or deferential weight. The ALJ concluded Dr. Johnson's opinion lacked supporting, proportionate objective medical evidence. The ALJ also stated there is very little evidence of a true longitudinal relationship between Dr. Johnson and the Plaintiff during the time period at issue. An ALJ's evaluation of the various medical source opinions of record begins with treating medical sources. The Regulations define a "treating source" as a physician or psychologist who has provided a claimant with "medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. §404.1502.

The only documented visit with Dr. Johnson was July 12, 2005. (Tr. 427). Although Social Security Regulations generally give greater deference to the opinions of a treating medical source over those of a non-treating medical source, *see Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007), as Plaintiff agrees, Dr. Johnson's treatment notes establish that she could not be considered a treating source at the time she provided her opinion. *See* Tr. 423-26; *see also* 20 C.F.R. §404.1502 (for treating-source status to exist, there must be an "ongoing treatment relationship..." ). Dr. Johnson was instead considered an examining physician on the

19

date she provided her opinion. Because of Dr. Johnson's non-treating status, Social Security Regulations required the ALJ to evaluate her opinion, and those of other non-treating medical sources, under several factors including "supportability, consistency, specialization," and certain "other factors." *See* 20 C.F.R. §404.1527(d)(3)-(5). The ALJ's explanation of why he declined to fully accept Dr. Johnson's opinion was sufficient to show that he evaluated this physician's opinions under the required regulatory factors of supportability and consistency. *See* Tr. 27-28. Although the ALJ's decision did not use these exact terms, the substance of his explanation regarding Dr. Johnson's opinions adequately addresses these factors. *See id.* In addition, the Diabetes Mellitus Residual Functional Capacity Questionnaire form Dr. Johnson completed does not contain any explanation or references to signs or symptoms to support her opinions about Plaintiff's work abilities. The form instead contains her diagnoses of non-insulin dependent diabetes, GERD, depression, edema, back pain, obesity, bronchial asthma and hyperlipidemia and unexplained check-marks in certain boxes. A review of Dr. Johnson's evaluation notes does not provide much additional information. *See* Tr. 416-31.

Plaintiff's reliance on certain objective medical testing at most shows only a conflict in the evidence, rather than an absence of substantial evidence supporting the ALJ's decision. *See, e.g.,* Doc. #6. The ALJ, moreover, considered this objective evidence as indicated by his descriptions of the objective medical evidence, *see* Tr. 27-28.

Accordingly, although Plaintiff's Statement of Errors suggests that the evidence should have been weighed differently, her assertions do not undermine the substantial evidence supporting the ALJ's assessment of the medical source opinions and his other findings. This court reviews the ALJ's factual findings only for substantial evidence. 42 U.S.C.

§ 405(g). *See, Brainard v. Secretary of Health and Human Services,* 889 F.2d 679 (6th Cir.

1989). Because there is substantial evidence in the record as a whole to support the ALJ's

finding of no disability, we cannot reverse the ALJ's decision simply because the evidence could

have supported a contrary outcome. *Casey v. Secretary of Health and Human Services,* 987 F.2d

1230 (6th Cir. 1993) at 1233. Consequently, the ALJ's decision must be affirmed. *See Jones v.*

*Commissioner of Social Security,* 336 F.3d 469, 477 (6th Cir. 2003); *see also Mullen v.*

*Bowen,* 800 F.3d 535, 545 (6th Cir. 1986).

For the above reasons, the Court concludes that the ALJ's decision is supported by

substantial evidence and should be affirmed.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner by **AFFIRMED** and this case be dismissed from the

docket of this Court.

Date: 3/30/04

Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS REPORT & RECOMMENDATION

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation within **TEN (10) DAYS** of the filing date of this Report and Recommendation. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).